IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

TIMOTHY RANKER                      )
                                    )
v.                                  )       No. 2:06-0035
                                    )       Judge Nixon/Bryant
SOCIAL SECURITY ADMINISTRATION      )


To:  The Honorable John T. Nixon, Senior Judge


## REPORT AND RECOMMENDATION

        This is a civil action filed pursuant to 42 U.S.C. §
405(g), to obtain judicial review of the final decision of the
Commissioner of Social Security denying plaintiff supplemental
security income ("SSI"), as provided under Title XVI of the
Social Security Act ("the Act"), as amended.  The case is
currently pending on plaintiff's motion for judgment on the
administrative record (Docket Entry No. 15), to which defendant
has responded (Docket Entry No. 22).  Upon consideration of these
papers and the transcript of the administrative record, and for
the reasons given below, the undersigned recommends that
plaintiff's motion be DENIED, and that the decision of the
Commissioner be AFFIRMED.


## I.  INTRODUCTION

        Plaintiff Timothy Ranker (hereinafter, "plaintiff")
filed a previous application for supplemental security income on

1

December 30, 1996.  (Tr. 214).  After denial at the initial and reconsideration levels, plaintiff filed a request for hearing. (Tr. 210).  Plaintiff waived the right to appear before the Administrative Law Judge ("ALJ"), and his application was denied by the ALJ on May 20, 1998.  (Tr. 212, 358-362).

Plaintiff filed the current application for supplemental security income on January 24, 2000.  (Tr. 400). Plaintiff's application was initially denied on April 5, 2000. (Tr. 366).  Plaintiff filed a request for reconsideration, which was denied on June 8, 2000.  (Tr. 368, 374).  Plaintiff filed a request for hearing on June 20, 2000.  (Tr. 378).

Plaintiff appeared before an ALJ on March 14, 2001, and the case was continued in order to allow him time to consult an attorney.  (Tr. 696, 711).  Plaintiff retained counsel, and the case was heard before an ALJ on July 5, 2001.  (Tr. 715).  In a decision dated September 28, 2001, the ALJ ruled that plaintiff was not entitled to supplemental security income payments.  (Tr. 44-50).  Plaintiff filed a request for review of the hearing decision on October 15, 2001.  (Tr. 51).  On October 28, 2002, the Appeals Council entered an order vacating the hearing decision and remanding the case to the ALJ.  (Tr. 53).

This matter was heard a second time before the ALJ on March 6, 2003.  (Tr. 751).  The ALJ ruled, in a decision dated April 30, 2003, that plaintiff was not entitled to supplemental

2

security income payments.  (Tr. 19-26).  Plaintiff filed a request for review of the hearing decision on June 23, 2003. (Tr. 14).  On January 30, 2004, the Appeals Council entered an order denying the request for review.  (Tr. 10).  Plaintiff filed an action in this Court and, on January 5, 2005, this Court entered an order reversing the decision of the Commissioner of Social Security and remanding the case for further proceedings. (Tr. 836).

On remand, this case was heard before a different ALJ on June 8, 2005.  (Tr. 872).  In a decision dated July 8, 2005, the ALJ ruled that plaintiff was not entitled to supplemental security income payments.  (Tr. 806-817).  The decision contains the following enumerated findings:

1.    The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

2.    The claimant's mild degenerative changes at the T8-9 level of the spine; mild disc bulging at the L5-S1 level of the spine; left shoulder pain; chronic obstructive pulmonary disease; depression; and borderline intellectual functioning are considered "severe" in combination based on the requirements in the Regulations 20 CFR § 416.920©).

3.    These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4.    The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

5.    The claimant has the residual functional capacity to perform activities not requiring lifting or carrying more than 20 pounds occasionally or 10 pounds

3

frequently; sitting, standing, or walking more than 6
hours each out of an 8 hour day; more than occasional
pushing or pulling with the left upper extremity; or an
excessive exposure to pulmonary irritants.  The
claimant must have the option to alternate between
sitting and standing at will.  The claimant is capable
of performing unskilled, low stress work that does not
require literacy or dealing with the public.

6.   The claimant has no past relevant work (20 CFR §
     416.965).

7.   The claimant is a "younger individual" (20 CFR §
     416.963).

8.   The claimant is "illiterate" (20 CFR § 416.964).

9.   The claimant has the residual functional capacity to
     perform a significant range of light work (20 CFR §
     416.967).

10.  Although the claimant's exertional limitations do not
     allow him to perform the full range of light work,
     using Medical-Vocational Rule 202.16 as a framework for
     decision-making, as well as the testimony of the
     vocational expert, there are a significant number of
     jobs in the national economy that he could perform.
     Examples of such jobs include the following light
     exertion jobs in the state and national economy;
     grader/sorter, numbering, 2,200 in the state economy
     and 86,000 in the national economy; inspector/checker,
     numbering 9,700 in the state economy and 29,000 in the
     national economy; and feeder/off-bearer, numbering
     1,600 in the state and 800,000 in the national economy.
     The vocational expert testified that the cited jobs
     were merely examples and were not an exhaustive list.

11.  The claimant was not under a "disability," as defined
     in the Social Security Act, at any time through the
     date of this decision (20 CFR § 416.920(g)).

(Tr. 815-16).

        On January 19, 2006, the Appeals Council denied

plaintiff's request for review of the decision of the ALJ (Tr.

790-92), thereby rendering that decision the final decision of

4

the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based on the record as a whole, then these findings are conclusive. Id.

## II. REVIEW OF THE RECORD

Plaintiff is a 42-year old man with a limited education; he was placed in special education classes and completed the tenth grade. (Tr. 411, 471-472, 475, 888-889). He is illiterate. (Tr. 562-563, 756-757, 816). Plaintiff seeks benefits beginning with the date of his current application, January 24, 2000, alleging an inability to work due to back and neck pain, chronic obstructive pulmonary disease, headaches, adhesive capsulitis of the left shoulder, and low intelligence. The ALJ found that plaintiff had no past relevant work. (Tr. 816).

### A. Medical Evidence

Psychological testing of plaintiff during elementary school yielded IQ scores of 82 in 1970, 74 in 1971, and 78 in 1972. (Tr. 471, 475). He was determined to be functioning in the range for the educable mentally retarded, and he was placed in special education classes. (Tr. 471-472, 475). He failed two grades. (Tr. 723-724).

5

Plaintiff's medical history includes injuries to his head, neck, and back. (Tr. 289-291, 293-298, 302-308). He had reconstructive surgery to repair a shattered left orbit. (Tr. 503, 509).

A consultative psychological evaluation in March 1997 revealed a verbal IQ of 74, a performance IQ of 68, and a full scale IQ of 71. (Tr. 324). Results of the Wechsler Memory Scale suggested difficulty with simple rote memory and memory for logical detail. (Tr. 324-325). The evaluator attempted to administer a reading test, but plaintiff could only sight read a few of the words. (Tr. 325). Administration of the WRAT showed a second grade level in sight reading. (Tr. 325). As to functional limitations, the evaluator opined that plaintiff's pace was somewhat slowed and that he might be overwhelmed in a rapidly changing environment. (Tr. 327). Plaintiff's ability to understand written instructions was severely impaired. His ability to understand verbal instructions was mildly impaired; and his ability to remember and carry out simple job instructions was moderately impaired. The evaluator further opined that plaintiff's ability to maintain attention and concentration was mildly impaired. He did not think plaintiff could manage his funds due to alcohol dependence and memory difficulties. (Tr. 327).

In September 1997, plaintiff injured his neck and head

6

again and thereafter began experiencing frequent headaches. (Tr. 347-351, 503, 509, 511). In 1998 and 1999, plaintiff sought treatment at the emergency room for pain in his shoulder, severe headaches, neck pain, and low back pain. (Tr. 503, 509, 511, 538, 586-590, 619-620, 623-634).

In January 2000, plaintiff went to the emergency room for back, neck and head pain. (Tr. 579-581). In April 2000, he was treated for chronic back pain. (Tr. 571-572).

A consultative psychological evaluation was done on March 21, 2000. (Tr. 560). Intelligence testing revealed a full scale IQ of 65, a performance IQ of 63, and a verbal IQ of 72. (Tr. 562). These scores were felt to be an accurate assessment of plaintiff's level of functioning. Results of the WRAT showed plaintiff to be at the first grade level in reading and at the second grade level in math. It was noted that these results substantiated plaintiff's allegation of illiteracy. (Tr. 562). The evaluators stated that plaintiff "does not appear to function very well on a day-to-day basis and seems to be quite dependent upon someone else to more or less provide for him and to watch out for him." (Tr. 563). Plaintiff's family would send money to support him; the evaluators stated that he had been "essentially homeless" at times. Given plaintiff's illiteracy and limited cognitive abilities, the evaluators felt that he would have difficulty with occupations requiring multi-level tasks. (Tr.

7

563). It was recommended that a financial guardian be appointed
to make sure any funds were used properly and that plaintiff was
not exploited by other people. (Tr. 564).

In June 2000, plaintiff sought treatment in the
emergency room for shortness of breath. (Tr. 612). Steroids
helped him feel better while he was taking them. (Tr. 614). In
July 2000, plaintiff was noted to have decreased air exchange and
increased wheeze. (Tr. 614). He was given refills on
prescriptions for a Proventil inhaler, Atrovent inhaler,
Prednisone, and Darvocet, and was referred to a pulmonologist.
(Tr. 612-613).

In December 2000 and on three occasions in February
2001, plaintiff was treated at the emergency room for pain in his
lower back and neck and shoulder as well as for shortness of
breath. (Tr. 619-637). In March 2001, plaintiff began receiving
care at the health department for emphysema and worsening back
pain. (Tr. 686-687).

Plaintiff began seeing pulmonologist Dr. Tina Dudney on
March 15, 2001. (Tr. 650-55). He reported shortness of breath
and dizziness. (Tr. 664). Dr. Dudney noted that plaintiff had
been exposed to copper dust for about six months at a job. He
was producing dark phlegm and had lost about twenty pounds over
the last six to eight months. (Tr. 664). He was also losing
hair. (Tr. 668). A CT scan of the thorax showed bullae and

8

blebs, primarily in the upper lobes. (Tr. 646). Cardiac stress testing was stopped due to back pain and shortness of breath. (Tr. 645, 649). Dr. Dudney diagnosed bullous lung disease. (Tr. 640). In May 2001, plaintiff was having a hard time breathing with increased wheezing. (Tr. 638). He would wake up coughing. Dr. Dudney's examination revealed decreased air movement, wheezing, and prolonged expirations. She continued to prescribe Serevent, Combivent, and Flovent and added Prevacid. (Tr. 638).

Dr. David Gaw performed a consultative examination in August 2001 to evaluate plaintiff's neck and back pain. (Tr. 688-93). Plaintiff complained of pain upon palpation and range of motion testing in the neck, shoulders, and lower back, but Dr. Gaw could elicit no muscle spasm in any related muscle groups, nor could he detect any muscle weakness, atrophy, or loss of sensation. Plaintiff's neck and lower back range of motion was limited by his subjective complaints of pain, though he displayed full shoulder range of motion through flexion and abduction, which reportedly caused pain in his neck. He completed a medical assessment in which he opined that plaintiff could occasionally lift or carry 20-30 pounds, frequently lift or carry 10 pounds and stand or walk for at least two hours in a workday. (Tr. 690). Dr. Gaw also assessed plaintiff as being capable of occasionally performing postural activities, though he assessed no limitations in sitting, pushing, or pulling. (Tr. 691).

9

Plaintiff sought treatment at the emergency room on August 8, 2001, for pain and tingling in his arm. (Tr. 165-168). He continued to receive treatment at the health department for shortness of breath and chronic low back pain. (Tr. 87-88, 91-93). In September 2001, he was treated at the emergency room for low back and cervical pain. (Tr. 158-163).

On October 3, 2001, plaintiff had cervical, thoracic, and lumbar MRIs. (Tr. 194-196). The thoracic MRI showed a very mild anterior loss of height at T8 and T9; the lumbar MRI showed an insignificant mild diffuse disc bulge at L5-S1. (Tr. 194-195). The cervical MRI was normal. (Tr. 196).

From October 2001 through August 2002, plaintiff received treatment at the emergency room and at the health department for chronic pain in his back and neck. (Tr. 84-90, 118-124, 139-143, 145-156). The health department referred him to a pain management clinic. (Tr. 84-87). The health department also treated Plaintiff for headaches, chronic obstructive pulmonary disease ("COPD"), and joint pain. (Tr. 84, 88).

In August 2002, plaintiff began receiving treatment from Dr. Rexford Agbenohevi. (Tr. 193). Plaintiff reported headaches and neck pain. (Tr. 193). Dr. Agbenohevi noted bilateral rhonchi; his diagnoses included chronic bronchitis. (Tr. 192). He prescribed Lodine, Neurontin, Wellbutrin (for smoking cessation), and Zantac. (Tr. 192). In September 2002,

10

Dr. Agbenohevi saw plaintiff for headaches, chronic bronchitis, back pain, and peptic ulcer disease. (Tr. 190-191). His examinations revealed paraspinal muscle spasm. Dr. Agbenohevi prescribed Combivent, Azmacort, Lortab, and Robaxin. (Tr. 190-191).

Plaintiff was evaluated by Dr. Michael Miller at the Vanderbilt Pain Clinic in October 2002. (Tr. 95-98). His medications included Percodan, Lortab, Lodine, Robaxin, Neurontin, and inhalers. (Tr. 96). Dr. Miller noted multiple trigger points in the lower back and bilateral shoulders. (Tr. 97). There were severe muscle spasms in both shoulder areas. Dr. Miller's impressions were degenerative disc disease, myofascial pain, mechanical low back pain and cervical neck pain. He ordered physical therapy and a TENS unit. He discontinued Lortab and Percocet, prescribed Zanaflex, and increased Neurontin. He referred plaintiff to an orthopedist for evaluation of a left shoulder mass. Dr. Miller noted that if Plaintiff's pain persisted despite these interventions he would consider sustained release narcotics. (Tr. 97).

Plaintiff continued to receive treatment from Dr. Agbenohevi for back and neck pain, left shoulder pain, COPD, and peptic ulcer disease. (Tr. 179-189). In October 2002, Dr. Agbenohevi noted rhonchi, lumbosacral muscle spasm, and tenderness with limited abduction and extension in the left

Case 2:06-cv-00035   Document 23   Filed 11/19/07   Page 11 of 37 PageID #: 85

shoulder. (Tr. 188). He prescribed medications, including Methocarbamol, Lortab, Ranitidine, and Combivent. (Tr. 187). In November 2002, Dr. Agbenohevi treated plaintiff for acute bronchitis and low back pain. (Tr. 186). Plaintiff went to the emergency room twice in December 2002 due to back pain. (Tr. 99-105, 112-117). At office visits in December 2002, Dr. Agbenohevi again noted bilateral rhonchi and paraspinal muscle spasm. (Tr. 183, 185). In February 2003, plaintiff reported shortness of breath and left shoulder pain. (Tr. 179- 181). Dr. Agbenohevi found rhonchi, limited back flexion, and power 4/5 globally in plaintiff's extremities. He refilled plaintiff's bronchodilators and pain medications (including Lortab, Baclofen for muscle spasms, and Neurontin). (Tr. 179, 181).

Dr. David Henson, a pulmonologist in practice with Dr. Dudney, completed a medical assessment in January 2003 in which he opined that plaintiff could occasionally lift or carry ten pounds, frequently lift or carry less than ten pounds, stand or walk at least two hours, and sit for less than about six hours in a workday with limited pushing or pulling with his arms and legs and no postural activities except balancing. (Tr. 75-76). Dr. Henson further stated that plaintiff could do only occasional reaching and was unable to reach over head. (Tr. 77). He was limited regarding exposure to temperature extremes, dust, humidity or wetness, hazards, or fumes/odors/chemicals/gases.

(Tr. 78).

Dr. Agbenohevi completed a medical assessment in February 2003 in which he opined that plaintiff could occasionally lift or carry ten pounds, frequently lift or carry less than ten pounds, stand or walk for about six hours, and sit for less than about six hours with limited pushing or pulling with his arms (due to tenderness and limited abduction in the left shoulder) and a sit/stand option. (Tr. 176-177). Dr. Agbenohevi further stated that plaintiff often had pain severe enough to interfere with attention and concentration. (Tr. 177). He needed to elevate his legs with prolonged sitting and was likely to be absent about two times a month due to his impairments. (Tr. 177). He could do only limited reaching due to limited abduction and extension in his left shoulder. (Tr. 178). Plaintiff was to avoid all exposure to dust, hazards, fumes/odors/dusts/gases, solvents or cleaners, soldering fluxes, cigarette smoke, and chemicals. He was also to avoid mold. (Tr. 178).

In July 2003, plaintiff was seen in the emergency room for chronic neck pain and pain in his left shoulder. (Tr. 962-963).

Plaintiff continued to receive treatment from Dr. Agbenohevi for pain in his back, left leg, and neck; headaches; left shoulder pain; and COPD. (Tr. 980-1009). In April 2003,

13

plaintiff complained of right shoulder pain. (Tr. 1008). Dr. Agbenohevi's examination revealed swelling in the right humerus, hardening with flexion at the elbow consistent with biceps tendon rupture, and limited abduction at the shoulder with tenderness over the rotator cuff muscles. He prescribed muscle relaxers, Hydrocodone for pain, and exercises. (Tr. 1008). In June 2003, plaintiff's complaints included back and leg pain; and Dr. Agbenohevi noted positive straight leg raising on the left. (Tr. 1006). He prescribed medications, including Neurontin and Lortab. (Tr. 1005). Plaintiff continued to report neck pain. (Tr. 1004). In September 2003, he reported an exacerbation of his back pain with pain in the left leg. (Tr. 1002). Dr. Agbenohevi also monitored plaintiff's chronic obstructive pulmonary disease and, in October and November 2003, treated him for an acute exacerbation of that condition. (Tr. 999, 1001). Later in November 2003, plaintiff saw Dr. Agbenohevi for headache and cervicalgia. (Tr. 998). In December 2003, plaintiff saw Dr. Agbenohevi for back pain with radiation to the left leg; the examination showed positive straight leg raising on the right. (Tr. 997). Dr. Agbenohevi renewed all of his medications, which included Singulair, Tizanidine, Neurontin, Ranitidine, Hydrocodone, and Combivent. (Tr. 997). Later that month, Plaintiff returned due to left shoulder pain; Dr. Agbenohevi noted limited abduction and tenderness. (Tr. 995).

14

In January 2004, Dr. Agbenohevi prescribed a cervical collar for neck pain. (Tr. 994). Plaintiff's neck and back pain were exacerbated by a car accident in February 2004. (Tr. 990-992). In March 2004, plaintiff continued to report neck pain, and Dr. Agbenohevi changed Percocet to Percodan. (Tr. 989). In June 2004, Dr. Agbenohevi prescribed prednisone for an exacerbation of COPD. (Tr. 984). In July 2004, plaintiff reported increased cough and pain in the neck and lower back. (Tr. 982). He complained of shortness of breath on exertion and of pain in his back and right leg. Dr. Agbenohevi noted diffuse muscle spasm in the lumbar region and positive straight leg raising on the right. He renewed Advair and pain medications. (Tr. 982). In August 2004, plaintiff saw Dr. Agbenohevi for neck pain. (Tr. 980). There was a spasm in the sternocleidomastoid muscles. Dr. Agbenohevi prescribed Percodan and changed Tizanidine to carisoprodol. (Tr. 980).

Plaintiff also continued to see Dr. Henson for COPD, restrictive airway disease, and asthmatic bronchitis. (Tr. 933-940). He reported shortness of breath with exertion. (Tr. 936, 939-940). In July 2004, plaintiff stated that his heart sometimes raced when his oxygen saturation levels were low (for example, when he exerted himself). (Tr. 935). Overnight oximetry showed desaturation events with a mean low of 88.8%. (Tr. 943-944). He was put on oxygen at night. (Tr. 935). In

15

April 2005, Dr. Henson discussed the use of pain patches for back lung pain. (Tr. 933).

B. <u>Hearing Testimony</u>

<u>July 2001</u>

At the hearing in July 2001, plaintiff testified that he had attended special education classes in school and had failed two grades. (Tr. 723-724). He stated that he could not read or write very well. (Tr. 724). He had taken his driver's license test orally, and a friend had completed all of his Social Security forms for him. (Tr. 724-725). He could not read the newspaper. (Tr. 725).

Plaintiff stated that he had applied for disability benefits in 1996 because of problems with pain in his back and neck and headaches. (Tr. 727-728). After being hit in the head with a four-by-four and in the face with a tire iron, he had experienced frequent headaches. (Tr. 728). He took Motrin and sometimes Vicodin and muscle relaxers to relieve the headaches, but the pain did not go away. (Tr. 730). He would use hot towels on his head too. (Tr. 730). When he got a headache, he felt sharp pains in the left side of his face above the eye (where he had been hit with the tire iron) and had to lie down. (Tr. 729). When the headache was especially bad and caused nausea, he sometimes sought treatment at the emergency room. (Tr. 730).

16

As to his back and neck pain, plaintiff stated that, since 1997, he had experienced constant stiffness and soreness and a grinding sensation in his neck and shoulder. (Tr. 732). He took Motrin and used heat and Bengay. The stiffness in his neck affected his shoulders and back, and he had difficulty using his arms. (Tr. 732). Plaintiff also had problems with pain and stiffness in his lower back; if he tried to bend over, he would get muscle spasms and be unable to move. (Tr. 732-733). Plaintiff estimated that his lower back pain immobilized him once or twice a week. (Tr. 733). Medications – Motrin and sometimes Vicodin and Percodan – provided some relief. (Tr. 734). Due to the pain in his neck and shoulder and the pain in his lower back, plaintiff spent much of the day (about five or six hours) lying down. (Tr. 735).

Plaintiff also testified about problems with shortness of breath that had developed over the past three or four years. (Tr. 735-736). He had cut down on the number of cigarettes he smoked due to his breathing problems. (Tr. 736). He used three different inhalers. (Tr. 737).

Plaintiff stated that the medications he took caused side effects of drowsiness, dizziness, and upset stomach. (Tr. 737).

Plaintiff estimated that he could lift a maximum of fifteen pounds without causing pain and spasm in his back. (Tr.

17

738).  The amount of time he could sit varied; on a good day, he could sit for up to two hours at a time.  If he stood too much on one side, plaintiff developed numbness and tingling in his legs and arms.  He estimated that he could stand for one to two hours. (Tr. 738).  Plaintiff thought he could walk for about ten minutes before he had trouble breathing.  (Tr. 739).  Prior to developing breathing problems, he could walk more.  (Tr. 739).

As to his daily activities, plaintiff stated that he helped with grocery shopping about once a month.  (Tr. 740).  He sometimes had difficulty walking around the store due to back and neck pain and spasms.  (Tr. 739-740).  He did not go out for social events much because his medications made him so sleepy; he and his girlfriend might go out to eat about once every six months.  (Tr. 740).  Plaintiff did not do much housework due to his back pain and breathing problems.  (Tr. 741).  He no longer swept, vacuumed, or washed dishes.  He could cook easy dishes at times and helped sort clothes for the laundry.  (Tr. 741).  The only yard work he had done was trimming a few times where the landlord's lawn mower did not get.  (Tr. 742).  Plaintiff testified that he usually went to bed at about 8:00 p.m. and got up around noon.  (Tr. 743).  Asked why he slept so long, plaintiff stated that it was because his medications made him so drowsy and his back hurt.  (Tr. 743).

Plaintiff lived with his girlfriend.  He had previously

18

lived with his mother.  (Tr. 744).

At the hearing on March 6, 2003 (after remand by the Appeals Council), plaintiff testified that he had completed the ninth or tenth grade and was in special education classes all through school.  (Tr. 756).  He had problems with reading, writing, and math.  He could read only some small words and could not read the newspaper.  (Tr. 756).  He had taken the test for his driver's license orally.  (Tr. 756-757).  He could not write a simple letter.  (Tr. 757).

Plaintiff testified that he had injured his back in 1997 and had been hit in the face with a tire iron.  (Tr. 759). Since that time, he had experienced migraine headaches, sometimes for a week at a time.  He injured his shoulder in 1998.  (Tr. 759).  Plaintiff stated that he had been unable to continue receiving treatment at the Vanderbilt Pain Clinic because the clinic no longer took TennCare.  (Tr. 760).

As to his headaches, plaintiff stated that they had not changed significantly since the last hearing.  (Tr. 761).  They could last all day or for several weeks.  At least twice a month, he experienced a bad headache that would make him sick; he could not eat and would have to lie down and cover up his head.  (Tr. 761).  He took Trazodone, which made him sleep, and Lortab, which

19

reduced the pain somewhat. (Tr. 762).

Plaintiff had back pain from his shoulder to the midspine area. (Tr. 762). He had numbness and tingling in his legs at times. (Tr. 762). He could hardly use his left arm (due to numbness) and sometimes had sharp pains from arthritis in his right arm. (Tr. 762-763). Plaintiff stated that he sometimes dropped things, such as a gallon of milk, when he used his left hand. (Tr. 763). The pain in his back worsened in bad weather. (Tr. 763-764). The medications provided relief for about four hours. (Tr. 765). Some of them made him sleepy and he would have to lie down. (Tr. 764). On a typical day, plaintiff would go back to bed after having breakfast and taking his medications. (Tr. 765). He would lie down during the day every day. (Tr. 765).

As to his breathing problems, plaintiff stated that he became short of breath after walking a short distance (to the mailbox and back). (Tr. 765). He cut down on his smoking and was taking Wellbutrin to help him quit. (Tr. 765-766). He used inhalers and did Albuterol treatments four times a day. (Tr. 766-767). He had trouble sleeping at night and would wake up during the night and take the Albuterol. (Tr. 767).

Plaintiff testified that, for the past six months or so, he had just been lying around the house. (Tr. 767). Before that, he had been able to do a few activities, such as bringing

20

in a little firewood. (Tr. 767). He went grocery shopping with his girlfriend about once a month. (Tr. 768). At the grocery store, he had difficulty walking around and would sit down if possible. (Tr. 768). After walking from the front to the back of the store, he would need a break. (Tr. 769). He could hardly lift a gallon of milk; this would make his neck, shoulder, and arm feel worse. Six months earlier, he had been able to carry an eight to ten pound bag of groceries. (Tr. 769).

Plaintiff estimated that he could sit for about 45 minutes to an hour. (Tr. 770). If he had to stay in one position, his pain would get worse. He needed to be able to adjust his position. (Tr. 770). He could no longer lift his two-year old child because she was too heavy. (Tr. 770-771).

Plaintiff testified that he did not engage in many social activities. (Tr. 770). He and his girlfriend might go to a birthday party or visit his mother's house about twice a year. (Tr. 770). He would drive once or twice a month to go get his medications. (Tr. 771).

<u>June 2005</u>

At the most recent hearing in June 2005, plaintiff testified that he could not read and write well and had taken an oral test when he got his driver's license. (Tr. 885). He was in special education classes in school. (Tr. 888). He could not fill out the Social Security forms himself. (Tr. 889).

21

Plaintiff described problems with his left shoulder since an injury. (Tr. 889). He felt a burning sensation in his shoulder; this was brought on by moving his arm. (Tr. 890). If he lifted the arm above shoulder level, plaintiff would have a burning sensation in his shoulder. (Tr. 891).

Plaintiff testified about his persistent neck pain. (Tr. 891). He described a burning sensation in his neck. (Tr. 891). Sometimes the pain would go all the way down to his left hand. (Tr. 892). Sometimes he felt a burning sensation in both shoulders. (Tr. 892).

As to the pain in his back, plaintiff stated that it affected the area from the center of his back down to his tailbone. (Tr. 893). He also had pain in his upper back between his shoulder blades.

Plaintiff took pain medications, which eased the pain for four or five hours at a time. (Tr. 892). He also took Neurontin for sharp pains and tingling in his legs as well as a muscle relaxer. (Tr. 893). The muscle relaxer made him drowsy. (Tr. 893). Plaintiff stated that the pain medications brought his pain down from a level ten (on a ten-point scale) to a level seven or so. (Tr. 894). He stated that his pain affected his ability to concentrate.

Plaintiff testified that his breathing problems had become worse than his pain problems over the past four years.

22

(Tr. 894-895). He used oxygen at night and as needed during the day. (Tr. 895). Plaintiff was using the oxygen on the day of the hearing because of high humidity. He also took medications through a nebulizer. (Tr. 896). Cold weather exacerbated plaintiff's breathing problems as well as causing joint stiffness. (Tr. 896-897). Environmental irritants such as dust, fumes, perfumes, and detergents could cause asthma attacks. (Tr. 897). Plaintiff also stated that his breathing problems caused him to feel tired. (Tr. 897). He would lie down to rest about three times a day. (Tr. 898).

Plaintiff also described problems with depression. (Tr. 898).

Asked about his functional abilities, plaintiff stated that he did not try to lift over two or three pounds; if he tried to lift more, he experienced pain in the middle of his tailbone and in his shoulders. (Tr. 899). He could not stand for more than 15 minutes, walk for more than 20 minutes, or sit for more than about an hour at a time. (Tr. 899).

As to his activity level, plaintiff stated that he did not do housework or yard work, but that he could go grocery shopping with his girlfriend and watch television. (Tr. 900-902). When he and his girlfriend went to the grocery store, plaintiff would sometimes sit in the car because he could not tolerate walking. (Tr. 901).

23

The vocational expert testified that a person who is unable to complete an eight-hour workday or who would miss three or more days a month would not be employable. (Tr. 913). She further testified that, if a person has no useful ability to make the occupational or performance adjustments required for work activity, there would be no available jobs. (Tr. 915-916).

III.  CONCLUSIONS OF LAW

A.  Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. Jones v. Sec'y of Health & Human Servs., 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. Landsaw v. Sec'y of Health & Human Servs., 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999)(citing Richardson v. Perales, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." Bell v.

24

<u>Comm'r of Soc. Sec.</u>, 105 F.3d 244, 245 (6th Cir. 1996). Even if
the evidence could also support a different conclusion, the
decision of the ALJ must stand if substantial evidence supports
the conclusion reached. <u>Her</u>, 203 F.3d at 389 (<u>citing</u> <u>Key v.</u>
<u>Callahan</u>, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the
record was not considered as a whole, the Commissioner's
conclusion is undermined. <u>Hurst v. Sec'y of Health & Human</u>
<u>Servs.</u>, 753 F.2d 517, 519 (6th Cir. 1985).

      B. <u>Proceedings at the Administrative Level</u>

      The claimant has the ultimate burden to establish an
entitlement to benefits by proving his or her "inability to
engage in any substantial gainful activity by reason of any
medically determinable physical or mental impairment which can be
expected to result in death or which has lasted or can be
expected to last for a continuous period of not less than 12
months." 42 U.S.C. § 423(d)(1)(A). At the administrative level
of review, the claimant's case is considered under a five-step
sequential evaluation process, as follows:

(1)  If the claimant is working and the work constitutes
     substantial gainful activity, benefits are automatically
     denied.
(2)  If the claimant is not found to have an impairment which
     significantly limits his or her ability to work (a "severe"
     impairment), then he or she is not disabled.
(3)  If the claimant is not working and has a severe impairment,
     it must be determined whether he or she suffers from one of

25

the "listed" impairments[1] or its equivalent; if a listing is
met or equaled, benefits are owing without further inquiry.

(4)  If the claimant does not suffer from any listing-level
impairments, it must be determined whether the claimant can
return to the job he or she previously held in light of his
or her residual functional capacity (e.g., what the claimant
can still do despite his or her limitations); by showing a
medical condition that prevents him or her from returning to
such past relevant work, the claimant establishes a <u>prima
facie</u> case of disability.

(5)  Once the claimant establishes a <u>prima facie</u> case of
disability, it becomes the Commissioner's burden to
establish the claimant's ability to work by proving the
existence of a significant number of jobs in the national
economy which the claimant could perform, given his or her
age, experience, education, and residual functional
capacity.

<u>Moon v. Sullivan</u>, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the
evaluation process can be carried by relying on the medical-
vocational guidelines, otherwise known as "the grid," but only if
the claimant is not significantly limited by a nonexertional
impairment, and then only when the claimant's characteristics
identically match the characteristics of the applicable grid
rule.  Otherwise, the grid can not be used to direct a
conclusion, but only as a guide to the disability determination.
<u>Id.</u>  In such cases where the grids do not direct a conclusion as
to the claimant's disability, the Commissioner must rebut the
claimant's <u>prima facie</u> case by coming forward with particularized
proof of the claimant's individual vocational qualifications to

---

[1]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P,
Appendix 1.

perform specific jobs, which is typically obtained through vocational expert (VE) testimony.  See <u>Varley v. Sec'y of Health & Human Servs.</u>, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere.  <u>See</u> 42 U.S.C. § 423(d)(2)(B); <u>Foster v. Bowen</u>, 853 F.2d 483, 490 (6th Cir. 1988).

C.  <u>Plaintiff's Statement of Errors</u>

Plaintiff alleges that the ALJ erred in rejecting the assessment of his treating physician, Dr. Agbenohevi, regarding his pain related exertional limitations, and further alleges error in the ALJ's analysis of his complaints of disabling pain. As detailed below, the undersigned finds no reversible error in the ALJ's decision, and concludes that the decision is supported by substantial evidence.

The Sixth Circuit has noted that ALJs are not bound by the opinions of treating physicians unless those opinions are both well supported by objective medical evidence, and not inconsistent with other substantial evidence of record.  <u>E.g.</u>, <u>Stiltner v. Comm'r of Soc. Sec.</u>, 2007 WL 2264414, *4 (6th Cir.

27

Aug. 7, 2007)(quoting 20 C.F.R. § 404.1527(d)(2)[2]).  However, if
controlling weight is not accorded the opinion of a treating
source, the ALJ must give good reasons for discounting that
opinion, by reference to the following regulatory factors
governing the weighing of such evidence:  the length of the
treatment relationship and the frequency of examination, the
nature and extent of the treatment relationship, the nature and
extent of relevant evidence that the treating physician presents
supporting his opinion, consistency of the opinion with the
record as a whole, and the treating physician's specialization.
20 C.F.R. § 416.927(d)(2)-(5); see also Wilson v. Comm'r of Soc.
Sec., 378 F.3d 541, 544 (6th Cir. 2004).  In the case at bar, the
ALJ was not bound to give controlling weight to Dr. Agbenohevi's
assessment, given the substantial medical evidence opposed to it,
including the findings and assessment of the consultative
examiner, Dr. Gaw.  In accord with his duty to give good reason
for his failure to give controlling weight to Dr. Agbenohevi's
assessment, the ALJ offered the following explanation:

> ... In March 2003, Dr. Agbenohevi completed a
> functional assessment form in which he opined that the
> claimant could perform sedentary to light exertion work
> and that he suffered from severe pain often.  As noted
> below, this assessment is assigned little weight
> because it is inconsistent with the claimant's
> objective scans and x-rays, benign clinical exam
> findings, and his conservative treatment of the

---

[2]The corresponding regulation which is applicable to Title XVI
applications such as the one at bar is 20 C.F.R. § 416.927(d)(2).

28

claimant.  His assessment is also inconsistent with the claimant's reported daily activities, outlined below.

(Tr. 810)

It has been established on this record that the cervical, thoracic, and lumbar MRIs done on plaintiff showed only mild abnormalities not expected to produce the degree of limitation alleged (Tr. 194-96, 867-68), and plaintiff does not argue otherwise.  Moreover, except for occasional notations of spasm in the rhomboid and lumbar musculature and one-sided positive results on straight-leg raise testing, results on musculoskeletal and neurological examination were in fact largely normal, with only mildly diminished strength in the left upper extremity and some reduction in shoulder range of motion.  The ALJ's determination of plaintiff's RFC credits these mild findings by incorporating limitations on pushing and pulling with the left upper extremity.  However, the ALJ rightly declined to adopt the more significant exertional limitations assessed by Dr. Agbenohevi on the basis of these relatively mild deficits to plaintiff's nondominant arm,[3] and/or on the basis of pain that is

_____

[3]It is noted that on April 21, 2003, Dr. Agbenohevi diagnosed rotator cuff syndrome in plaintiff's right (dominant) shoulder, based on a four-day history of moderate pain and difficulty lifting the right arm, as well as the following physical examination findings:  "Swelling anterior aspect of right humerus, hardening with flexion at the elbow, consistent with biceps tendon rupture.  Limited abduction at the shoulder with tenderness over the rotator cuff muscles." (Tr. 1008)  However, this is the only mention in Dr. Agbenohevi's treatment notes--or anywhere else in the medical record--of such impairment to the right shoulder, and plaintiff's testimony at his most recent hearing, in June 2005, revealed that his complaints were almost entirely related to the left side of his body (Tr. 886-87, 889-92).

29

"often" severe.  In particular, this severity of pain is not borne out by Dr. Agbenohevi's treatment notes (Tr. 179-193, 980-1009), which consistently reflect plaintiff's report of a moderate level of baseline chronic pain, subject only to infrequent periods of exacerbation which were expected to resolve (Tr. 183, 1004).[4]  The undersigned therefore finds that, by his citation to the medical record, the ALJ fulfilled his duty to give good reasons in support of the decision to partially discount Dr. Agbenohevi's assessment.

As to the ALJ's reasoning that Dr. Agbenohevi's assessment is inconsistent with both his conservative treatment of plaintiff and plaintiff's daily activity level, the undersigned is inclined to agree with plaintiff that these factors are less than compelling.  As to the conservative course of plaintiff's treatment, it is by no means clear from the medical records that there was an available or potentially available surgical alternative to address plaintiff's pain related to muscle spasms,[5] as the ALJ implies when he notes that

---

[4]On December 30, 2002, plaintiff reported a four-day worsening of his back pain, describing the intensity of the pain as severe (Tr. 183); Dr. Agbenohevi treated plaintiff's symptoms and directed that he "return to the clinic in one week if not back to normal."  (Plaintiff did not return until one month later.)  On July 17, 2003, plaintiff presented "with pain in the neck more than his usual pain," describing the intensity of the pain as moderate (Tr. 1004); this level of pain does not appear from subsequent treatment notes to have persisted.

[5]Again, it had already been established before the agency and this Court that plaintiff's pain would not be reasonably expected to result from the minimal structural abnormalities in his thoracic and lumbar spine (Tr. 867-68).

plaintiff "admitted that he has not required any surgery for his pain." (Tr. 808) Without this option, and since plaintiff's physicians had given a referral to a pain specialist who essentially concurred with the treatment regime already in place, their decision to stay the course of narcotic analgesic and muscle relaxant therapy[6] is not properly discounted as conservative, in the undersigned's view. Moreover, the limitations assigned by Dr. Agbenohevi are not inconsistent with plaintiff's limited range of activities since January 2000, including the preparation of simple meals, going shopping once a month at Wal-Mart or the grocery store, occasionally receiving visitors in his home, and every six months going out to eat and attending family gatherings. Nonetheless, for the reasons given above in relation to the medical evidence, the undersigned concludes that the ALJ's treatment of Dr. Agbenohevi's assessment is supported by substantial evidence.

Regarding the ALJ's assessment of plaintiff's subjective pain complaints, it appears that the ALJ's determination was driven in equal parts by the lack of objective medical evidence which would corroborate those complaints, and by the ALJ's conviction that plaintiff's testimony was simply not credible. It is well established that an ALJ may properly

---

[6]It bears noting that plaintiff was reportedly allergic to non-steroidal anti-inflammatory drugs, perhaps partially explaining the resort to narcotic painkillers.

31

consider the credibility of a claimant when making his disability determination, and that this credibility finding is due great weight and deference in light of the ALJ's opportunity to observe the claimant's demeanor while testifying.  <u>Jones v. Comm'r of Soc. Sec.</u>, 336 F.3d 469, 476 (6th Cir. 2003).  There is likewise no question that a claimant's subjective complaints can support a finding of disability--irrespective of the credibility of that claimant's statements--if they are grounded in an objectively established, underlying medical condition and are borne out by the medical and other evidence of record.  20 C.F.R. § 416.929(c)[7]; <u>e.g.</u>, <u>Walters v. Comm'r of Soc. Sec.</u>, 127 F.3d 525, 531 (6th Cir. 1997); <u>Social Security Ruling 96-7p</u>, 1996 WL 362209, 61 Fed. Reg. 34483, at *34484-34485 (describing the scope of the analysis as including "the medical signs and laboratory findings, the individual's own statements about the symptoms, any

---

[7]Section 416.929(c) provides that, "[w]hen the medical signs or laboratory findings show that you have a medically determinable impairment(s) that could reasonably be expected to produce your symptoms, such as pain," the entire record of medical and nonmedical evidence will be considered in evaluating the intensity and persistence of those symptoms, including the following factors:
    (i) Your daily activities;
    (ii) The location, duration, frequency, and intensity of your pain or other symptoms;
    (iii) Precipitating and aggravating factors;
    (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
    (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
    (vi) Any measures you use of have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
    (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.
20 C.F.R. § 416.929(c)(3).

statements and other information provided by treating or examining physicians or psychologists or other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record"; "[A] finding that an individual's statements are not credible, or not wholly credible, is not in itself sufficient to establish that the individual is not disabled.").

In considering the ALJ's finding on the weight of plaintiff's subjective complaints, this Court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [plaintiff] are reasonable and supported by substantial evidence in the record." Jones, 336 F.3d at 476. His explanation by reference to proof of plaintiff's lack of candor is entirely reasonable and substantially supported: plaintiff neglected to mention his most recent arrest when questioned about his arrest history, until confronted with evidence of that arrest (Tr. 813, 880-83), and also engaged in activities prior to the date of his current benefits application (but during a period in which he nonetheless claimed to be disabled, Tr. 214, 400, 405) that are plainly inconsistent with the claim of disability, including loading and unloading a lawnmower on and off the back of a truck, loading 4 x 4 lumber onto a truck, and chopping wood (Tr. 814). The ALJ in his credibility assessment also reasonably made note of plaintiff's

33

narcotic-seeking behavior during emergency room visits between
1997 and 2005, his continuing to apply for disability while not
attempting to work since the age of 18, and his continued pack-a-
day smoking habit despite his severe pulmonary impairment (Tr.
813).

Leaving aside issues of pure credibility, this Court
has previously recognized plaintiff's documented muscle spasms as
objective indicia of pain sufficient to require the full analysis
described in 20 C.F.R. § 416.929(c). (Tr. 866-70) It is clear
that the ALJ understood this duty (Tr. 812), and just as clear
that he deemed plaintiff's muscle spasms to be of insignificant
severity, inasmuch as the decision does not mention them even
once, but mentions the lack of "significant neurological or
musculoskeletal abnormalities" to support Dr. Agbenohevi's
assessment (Tr. 813). Of course, it is noteworthy that even Dr.
Agbenohevi's assessment of plaintiff's functional abilities (Tr.
1777) is less restrictive than plaintiff's own description of
those abilities (Tr. 899), only citing plaintiff's left upper
extremity impairment as the source of his limitations, despite
the fact that Dr. Agbenohevi also treated plaintiff's lower back
pain. Regardless, it would appear that a number of the factors
identified in § 416.929(c) support the existence of a greater
severity of pain than the bulk of the medical evidence would
suggest: plaintiff's reported daily activities are limited, he

34

has longstanding prescriptions for narcotic pain medications and muscle relaxants, and his physicians have on occasion been able to reproduce muscle spasms in his rhomboid and lumbar musculature, as well as occasionally eliciting pain on straight-leg raise testing. However, it appears that the ALJ was not only mindful of these factors that he was bound to consider, but deemed them persuasive enough to require that partial credit be given to plaintiff's allegations of neck and back pain, which accounted for plaintiff's limitation to light work with a sit/stand option (Tr. 813), despite the less restrictive assessment of Dr. Gaw and what was viewed as a record of mostly benign clinical evidence. The ALJ plainly did not deem the regulatory factors persuasive enough to support plaintiff's claim of total disability due to pain, in light of the credibility issues and objective medical evidence previously mentioned. Particularly giving the ALJ the deference he is due in matters affecting the determination of credibility, and in the absence of legal error such as was committed by the first ALJ in failing to evince his consideration of § 416.929(c), the undersigned must conclude that the forgiving substantial evidence standard is met here. Upon discerning such support for the administrative decision, the Court is not free to second guess administrative findings on credibility or re-weigh the evidence, but must affirm. See Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 528

35

(6th Cir. 1997); <u>Mullen v. Bowen</u>, 800 F.2d 535, 545 (6th Cir. 1986).

In sum, the undersigned finds the Commissioner's decision to be supported by substantial evidence and free of legal error, and therefore concludes that it should be affirmed.

## IV.   RECOMMENDATION

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be DENIED, and that the decision of the Commissioner be AFFIRMED.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Cowherd v. Million</u>, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

36

**ENTERED** this 19th day of November, 2007.

　　　　　　　　　　　　　　　 s/ John S. Bryant
　　　　　　　　　　　　　　　JOHN S. BRYANT
　　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE

Case 2:06-cv-00035   Document 23   Filed 11/19/07   Page 37 of 37 PageID #: 111